## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Debra Anderson, | ) |
| | ) |
| **Plaintiff,** | ) **Civil Case No.:** |
| | ) |
| v. | ) **Judge:** |
| | ) |
| **SYNGENTA CROP PROTECTION LLC,** | ) **COMPLAINT** |
| **SYNGENTA AG and CHEVRON U.S.A.,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## COMPLAINT

Plaintiff Debra Anderson ("Plaintiff") brings this Complaint against Defendants, Syngenta Crop Protection LLC, Syngenta AG, and Chevron U.S.A., Inc. (collectively "Defendants"), and allege as follows:

### I.     SUMMARY OF THE CASE

1.     The manufacturers and sellers of paraquat deliberately concealed the dangers of paraquat for at least four decades, hid evidence of its dangers from government safety agencies, and knowingly unleashed a product they knew caused Parkinson's Disease on the public.

2.     Paraquat is a synthetic chemical compound[51] that, since the mid-1960s, has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat products") developed, registered, formulated, distributed, and sold for use in the United States ("U.S."), including the State of Kansas and Montana ("the State of Exposure").

---

[51] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

3.      From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries,[52] and from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor[53] of Defendant Syngenta AG ("SAG") and/or Defendant Syngenta Crop Protection LLC ("SCPLLC"), were engaged, directly, acting in concert with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in paraquat products, and developing, registering, formulating, and distributing paraquat products, for sale and use in the U.S., including the State of Exposure ("the U.S. paraquat business").

4.      From approximately May 1964 through approximately September 1986, CHEVRON, a predecessor of Defendant CHEVRON U.S.A., INC. ("CUSA"), was engaged, directly and/or acting in concert with ICI,[54] in all aspects of the U.S. paraquat business.

5.      Between approximately May 1964 and approximately September 1986, ICI manufactured and sold to CHEVRON paraquat ("ICI-CHEVRON paraquat") for use by CHEVRON, and others to which CHEVRON distributed it, as an active ingredient in paraquat products that CHEVRON and others formulated and distributed for sale and use in the U.S. ("ICI-

---

[52] As used in this Complaint, "subsidiary" means a corporation or other business entity's wholly-owned subsidiary that is or formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

[53] As used in this Complaint, "predecessor" means a corporation or other business entity or subsidiary thereof, to which a Defendant is a successor by merger, continuation of business, or assumption of liabilities, that formerly was engaged in the U.S. paraquat business directly or acting in concert with others.

[54] As used in this Complaint, "ICI" means ICI Limited and various ICI Limited subsidiaries through approximately June 1981 and ICI PLC and various ICI PLC subsidiaries thereafter.

CHEVRON paraquat products"), including the State of Exposure. The paraquat products formulated and distributed for sale and use in the U.S. by CHEVRON between May 1964 and approximately 1986 were still in distribution for sale and use in the U.S., including the State of Exposure, up and through the year 1989.

6.      From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

7.      From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC),  and most recently SAG and certain SAG subsidiaries (including SCPLLC), have manufactured paraquat ("ICI-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in paraquat products that SCPLLC and its predecessors and others have distributed for sale and use in the U.S., including the State of Exposure ("ICI-SYNGENTA paraquat products").

8.      Upon information and belief, Plaintiff used ICI-CHEVRON paraquat products and/or ICI-SYNGENTA paraquat products (collectively, "Defendants' paraquat products").

9.      Upon information and belief, Plaintiff used Defendants' paraquat products regularly and frequently over a period of many years.

10.     As a result of Plaintiff's many years of regular, frequent, and prolonged exposure to Defendant's paraquat products, Plaintiff contracted Parkinson's disease.

11.     Plaintiff brings this case to recover from Defendants, under the following theories of liability, compensation for injuries and damages caused by the exposure of Plaintiff to paraquat from Defendants' paraquat products, plus costs of suit: strict product liability—design defect; strict product liability—failure to warn; negligence; breach of express warranties and implied warranty of merchantability; violations of the consumer fraud and deceptive business practices act; and fraudulent misrepresentation.

## II.     PARTIES

**A.  Plaintiff**

12.     Plaintiff is a resident of Kansas ("State of Residence").

13.     Plaintiff was born on or around 1/27/1957. They were  exposed to Defendants' paraquat products throughout their life in the State of Exposure.

14.     Plaintiff came into contact with Defendants' products between 1967-1974.

15.     Plaintiff touched, absorbed, inhaled, inadvertently ingested, or otherwise came into contact with Defendants' paraquat products for 7 years while they were either mixing, loading, spraying, handling, or otherwise coming into contact with Defendants' paraquat products.

16.     Each exposure of Plaintiff to Defendants' paraquat products caused or contributed to causing Plaintiff's development of Parkinson's disease, with which they were diagnosed with on or about 2015.

17.     Plaintiff's exposure initiated a decades-long process in which oxidation and oxidative stress, created or aggravated by the ongoing redox cycling of paraquat, damaged and interfered with essential functions of dopaminergic neurons in her SNpc, resulting in the ongoing degeneration and death, as time passed, of progressively more dopaminergic neurons.

18.     Defendants, and those with whom they were acting in concert, manufactured and distributed the paraquat that was used in formulating Defendants' paraquat products and to which Plaintiff was exposed, and formulated and distributed Defendants' paraquat products that contained the paraquat to which Plaintiff was exposed, intending or expecting that these products would be sold and used in the State of Exposure.

19.     When Plaintiff was exposed to paraquat, they neither knew nor could have expected that paraquat was neurotoxic or that exposure to it could cause any neurological injury or neurodegenerative disease.

20.     When Plaintiff was exposed to paraquat, they neither knew nor could have expected that wearing gloves, a mask, or other personal protective equipment or taking any other precautions might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to paraquat.

21.     Plaintiff only recently learned that paraquat caused Plaintiff's injuries. Prior to this, they did not have knowledge of any facts that would have put them on notice that Plaintiff's Parkinson's Disease was due to Defendants' product nor has there been widespread media coverage that put them on notice.

22.     Plaintiff did not know and was unable to learn of the connection between Defendants' product and Plaintiff's injuries due to the concealment of the information by Defendants and its ongoing public campaign stating there is no connection between paraquat and Parkinson's Disease.[55]

---

[55] See www.paraquat.com, https://www.paraquat.com/en/safety/safety-humans/paraquat-and-parkinsons-disease, and https://www.syngenta.com/sites/syngenta/files/pdf/a-review-of-rviews.pdf (last visited on 10/20/2023).

23.     Statements that Defendants intended Plaintiff and other members of the public to rely on when they knew or should have known were either not true or misleading.

**B.  Defendants**

24.     SCPLLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly-owned subsidiary of Defendant SAG.

25.     SAG is a foreign corporation with its principal place of business in Basel, Switzerland.

26.     CUSA is a Pennsylvania corporation with its principal place of business in San Ramon, California.

### III.     JURISDICTION

27.     This Court has subject matter jurisdiction over this action because diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3).

28.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of her claims against Defendants.

29.     Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

        a.  Plaintiff is a citizen of the State of Residence;

        b.  SCPLLC is a citizen of the States of Delaware and North Carolina;

        c.  CUSA is a citizen of the States of Pennsylvania and California; and

        d.  SAG is a citizen or subject of the nation of Switzerland.

30.     This Court has personal jurisdiction over each of the Defendants in this diversity case because a state court in the State of Exposure would have such jurisdiction, in that:

    a.  Over a period of two (Chevron) to six (Syngenta) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured paraquat for use as an active ingredient in paraquat products, distributed paraquat to formulators of paraquat products, formulated paraquat products, marketed paraquat products to the agricultural community of the State of Exposure and/or State of Residence, and/or distributed paraquat products, intending that such products regularly would be, and knowing they regularly were, sold and used in the State of Exposure and/or State of Residence;

    b.  Plaintiff's claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s), together with those with whom they were acting in concert, with the State of Exposure and/or State of Residence; and

    c.  These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Exposure and/or State of Residence , were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of Exposure and/or State of Residence does not offend traditional notions of fair play and substantial justice.

## IV.     VENUE

31.     Venue is proper in this district because this Complaint is being filed directly into MDL No. 3004 in accordance with CMO 1. Should this case be remanded, its proper venue would be the District of Kansas under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in that district, in that Plaintiff's claims arise from injuries caused by the exposure of Plaintiff to paraquat from paraquat products that were distributed and sold for use in that district, were purchased or purchased for use in this district, and were being used in this district when the exposures that caused the injuries occurred.

32.     The filing of this Complaint in the Southern District of Illinois is not intended as a waiver of any rights relating to *Lexecon*, venue, or choice of law. To the contrary, Plaintiff expressly reserves any *Lexecon* rights or rights relating to venue or choice of law.

## V.      ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**C. Defendants and their predecessors**

    **a.      Syngenta Crop Protection LLC and Syngenta AG**

33.     SAG is the successor in interest to the crop-protection business of each of its predecessors, AstraZeneca PLC ("AstraZeneca"), Zeneca Group PLC ("Zeneca Group"), ICI PLC, ICI Limited, and Plant Protection Limited ("PP Limited") and their respective crop-protection subsidiaries (collectively, "SAG's predecessors"), in that:

    a.    SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

    b.    SCPLLC has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SCPLLC's predecessors.

34.     SCPLLC is the successor in interest to the crop-protection business of each of its predecessors, Syngenta Crop Protection, Inc. ("SCPI"), Zeneca Ag Products, Inc. ("Zeneca Ag"), Zeneca, Inc. ("Zeneca"), ICI Americas, Inc. ("ICIA"), ICI United States, Inc. ("ICI US"), and ICI America Inc. ("ICI America") (collectively, "SCPLLC's predecessors"), in that:

    a.    SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

    b.    SCPLLC has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SCPLLC's predecessors.

35.     At all relevant times, SCPLLC, SCPI, Zeneca Ag, Zeneca, ICIA, ICI US, and/or ICI America was a wholly-owned U.S. crop-protection subsidiary of SAG or a predecessor of SAG.

36.     At all relevant times, PP Limited was a wholly-owned U.K. crop-protection subsidiary of ICI Limited, an unincorporated division of ICI Limited, or an unincorporated division of ICI PLC.

37.     At all relevant times, SAG and its predecessors exercised a degree of control over their crop-protection subsidiaries so unusually high that these subsidiaries were their agents or alter egos.

**b.     Chevron U.S.A., Inc.**

38.     CUSA is the successor in interest to CHEVRON's crop-protection business, in that it has expressly assumed any liability on claims arising from the historical operation of that business.

**D.  Paraquat manufacture, distribution, and sale**

39.     ICI Limited discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

40.     ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

41.     In May 1964, ICI Limited, PP Limited, and CHEVRON entered into an agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

42.     As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

43.     In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquat licensing and distribution agreement that superseded the May 1964 agreement.

44.     In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part and amended in part the April 1975 agreement.

45.     From approximately May 1964 through approximately September 1986, pursuant to these paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. paraquat business.

46.     In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

47.     Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their paraquat licensing and distribution agreement.

48.     Although the September 1986 termination agreement gave ICI the right to buy, or exchange for ICI-labeled paraquat products, CHEVRON-labeled paraquat products that CHEVRON had already sold to its distributors, CHEVRON-labeled paraquat products continued to be sold for use in the U.S. after this agreement up and through the year 1989.

49.     SAG, SAG's predecessors, and subsidiaries of SAG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including the State of Exposure, than all other paraquat manufacturers combined.

50.     From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including the State of Exposure.

10

51.     From approximately September 1986 through the present, SYNGENTA has:

a.   manufactured paraquat for use as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including the State of Exposure;

b.   distributed paraquat for use as an active ingredient in paraquat products formulated and distributed for sale and use in the U.S., including the State of Exposure;

c.   formulated paraquat products distributed for sale and use in the U.S., including the State of Exposure; and

d.   distributed paraquat products for sale and use in the U.S., including the State of Exposure.

**E.  Paraquat use**

52.     Defendants' paraquat products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat products for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

53.     Defendants' paraquat products were commonly used multiple times per year on the same ground, particularly when used to control weeds in orchards and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' paraquat products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

54.     Defendants' paraquat products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' paraquat products

in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

55.     Defendants' paraquat products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added by users of Defendants' products, to increase the ability of paraquat to stay in contact with and penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' paraquat products as so formulated and/or with such substances added was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

56.     Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' paraquat products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON.

**F.  Paraquat exposure**

57.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

58.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind), contact with sprayed plants and being exposed by paraquat that was absorbed into the soil and ground water and wells. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by, SYNGENTA and CHEVRON, that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

59.     When Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

60.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin,

mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

61.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

62.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

63.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the

enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

64.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

65.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

66.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the

blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

67.     At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON that when Defendants' paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to paraquat products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

**G. Parkinson's disease**

68.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

69.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

70.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask- like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

71.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

72.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

73.     The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

74.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

75.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

76.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

77.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

78.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

79.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

## H.  Paraquat's toxicity

80.    Paraquat is highly toxic to both plants and animals because it causes and contributes to cause the degeneration and death of living cells in both plants and animals.

81.    Paraquat causes and contributes to cause the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

82.    In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

83.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

84.     Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

85.     The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to SYNGENTA and CHEVRON at all relevant times.

86.     That paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known to science since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, to SYNGENTA and CHEVRON at all relevant times.

87.     The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which SYNGENTA and CHEVRON should have known in the exercise of ordinary care, and did know, at all relevant times.

88.     The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. SYNGENTA and CHEVRON should have known this in the exercise of ordinary care, and did know this, at all relevant times.

### I. Paraquat and Parkinson's disease

89.     The scientific community overwhelmingly agrees that paraquat causes Parkinson's disease.

90.     Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals' conditions that show features characteristic of Parkinson's disease in humans.

91.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

92.     In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

93.     Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

94.     Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

**J.  Paraquat regulation**

95.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

96.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

97.     As a general rule, FIFRA requires registrants—not the EPA—to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

98.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

    b.  its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.  it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

    d.  when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

99.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

100.    Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

101.    However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

102.    FIFRA further provides that "…it shall be unlawful for any person in any State to distribute or sell to any person… any pesticide which is… misbranded." 7 U.S.C. § 136j(a)(1)(E).

103.    A pesticide is misbranded under FIFRA if, among other things:

   a.    its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

   b.    the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

   c.    the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

104.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed

to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA.

105.    Plaintiff brings claims and seek relief in this action only under state law. Plaintiff does not bring any claims or seek any relief in this action under FIFRA.

### VI.    FRAUDULENT CONCEALMENT AND TOLLING

106.    Plaintiff did not discover this earlier because Plaintiff had no reason to suspect that Plaintiff's contact with Paraquat could cause Plaintiff to suffer Parkinson's disease.

107.    Defendants took active steps to conceal this harmful side effect of Paraquat.

108.    Indeed, in response to growing concerns regarding the safety of Paraquat, Syngenta published a website at www.paraquat.com and specifically the page https://www.paraquat.com/en/safety/safety-humans/paraquat-and-parkinsons-disease as well as https://www.syngenta.com/sites/syngenta/files/pdf/a-review-of-rviews.pdf (all three sites last visited on October 20, 2023) for the purpose of convincing the public that Paraquat is safe.

109.    Syngenta's statements proclaiming the safety of Paraquat and disregarding its dangers were designed to mislead the agricultural community and the public at large – including Plaintiff.

110.    Defendants knew or should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

111.    However, despite this knowledge, Defendants continued to promote its product as safe.

112.    Defendants did not make this knowledge known to Plaintiff or the general public. Indeed, Defendants failed to adequately warn and instruct Plaintiff and Plaintiff of a possible association between Paraquat use and Parkinson's disease.

113.    Even today, Syngenta disavows any connection between Paraquat and Parkinson's disease.

114.    Defendants' acts and omissions were a legal, proximate, and substantial factor in causing Plaintiff to suffer severe and permanent physical injuries, pain, mental anguish, and disability, as well as economic loss, and will continue to do so for the remainder of Plaintiff's life.

115.    All applicable statutes of limitations have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

## VII.    ALLEGATIONS COMMON TO SPECIFIC CAUES OF ACTION[56]

### K.  Strict Product Liability – Design Defect

116.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the business of designing, manufacturing, and selling paraquat within the U.S.

117.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Exposure.[57]

---

[56] When used in an allegation in section VII or VIII of this Complaint, where the name of the party is not specified: (1) "Defendant" refers to the Defendant or Defendants from whom relief is sought in the Count in which the allegation appears or is incorporated and/or the predecessors of that Defendant or those Defendants; and (2) "Plaintiff" refers to the Plaintiff seeking relief in the Count in which the allegation appears or is incorporated, where the Count seeks damages for personal injuries.

[57] When used in an allegation in section VII or VIII of this Complaint, "Defendants' paraquat products": (1) refers to ICI-CHEVRON paraquat products and/or ICI-SYNGENTA paraquat products when the allegation appears or is incorporated in a Count directed to SCPLLC and SAG; refers only to ICI- CHEVRON paraquat products when the allegation appears or is incorporated in a Count directed to CUSA.

118. Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including the State of Exposure.

119. Upon information and belief, for many years, Plaintiff used Defendants' paraquat products in the State of Exposure repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

120. At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert, in that:

   a. they were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

   b. when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

121. At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

122. At all relevant times, Defendants and those with whom they were acting in concert knew or foresaw that this defective condition of Defendants' paraquat products would create a

substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

123.    As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

124.    At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

125.    At all relevant times, Defendants concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between Plaintiff's injury and paraquat.

**L.  Strict Product Liability – Failure to Warn**

126.    At all relevant times, Defendants and those with whom it was acting in concert were engaged in the U.S. paraquat business.

127.    At all relevant times, Defendants and those with whom it was acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Exposure.

128.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including the State of Exposure.

129.    For many years, Plaintiff used Defendants' paraquat products in the State of Exposure repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

130.    At all relevant times, Defendants and those with whom they were acting in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

    a.    Defendants' paraquat products were designed, manufactured, formulated, and packaged such that when so used, paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

131.    At all relevant times, Defendants' paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert, in that:

    a.    they were not accompanied by directions for use that would have made paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.    they were not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were

27

likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

132.     At all relevant times, this defective condition in Defendants' paraquat products existed when they left the control of Defendants and those with whom they were acting in concert and were placed into the stream of commerce.

133.     At all relevant times, Defendants and those with whom they were acting in concert knew this defective condition of Defendants' paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

134.     As a result of this defective condition, Defendants' paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

135.     At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

136.     At all relevant times, Defendants' concealed the defective condition of their product from Plaintiff thus preventing Plaintiff from discovering the causal link between their injury and paraquat.

**M. Negligence**

137.     At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

138.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Exposure.

139.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including the State of Exposure.

140.    Upon information and belief, for many years, Plaintiff used Defendants' paraquat products in the State of Exposure repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

141.    At all relevant times, in designing, manufacturing, and distributing paraquat for use in formulating paraquat products and in designing, formulating, packaging, labeling, and distributing paraquat products, Defendants and those with whom they were acting in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiff, whom it was reasonably foreseeable could be exposed to paraquat in such products.

142.    When Defendants and those with whom they were acting in concert designed, manufactured, and distributed paraquat for use in formulating Defendants' paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendant did know, that when Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert:

      a.   they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used

them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

143.  In breach of their duty to Plaintiff, Defendants and those with whom they were acting in concert negligently, and in conscious disregard for the safety of others:

a.  failed to design, manufacture, formulate, and package Defendants' paraquat products to make paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

b.  designed and manufactured paraquat and designed and formulated Defendants' paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

c.  failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

d.  failed to perform adequate testing to determine the extent to which spray drift from Defendants' paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' paraquat products or nearby during or after spraying;

e.  failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or

orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

f.   failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

g.   failed to direct that Defendants' paraquat products be used in a manner that would have made it unlikely for paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.   failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

144.   At all relevant times, Defendants' paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom they were acting in concert.

145.   At all relevant times, Defendants' concealed the dangers of their product as listed above from Plaintiff thus preventing Plaintiff from discovering the causal link between Plaintiff's injury and paraquat.

31

**N.  Breach of Express Warranties and Implied Warranty of Merchantability**

146.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

147.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Exposure.

148.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including the State of Exposure.

149.    Plaintiff used Defendants' paraquat products in the State of Exposure repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

150.    At the time of each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, Defendants and those with whom they were acting in concert made express warranties and/or impliedly warranted that that Defendants' paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

151.    Defendants and those with whom they were acting in concert breached this warranty as to each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, in that Defendants' paraquat products were not of merchantable quality because they were not fit for the ordinary purposes for which such goods were used, and in particular:

      a.    they were designed, manufactured, formulated, and packaged such that paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used

them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

b. when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

## O. Fraudulent Misrepresentation

152.    At all relevant times, Defendants and those with whom they were acting in concert were engaged in the U.S. paraquat business.

153.    At all relevant times, Defendants and those with whom they were acting in concert intended and expected that Defendants' paraquat products would be sold and used in the State of Exposure.

154.    Defendants and those with whom they were acting in concert developed, registered, manufactured, distributed, and sold paraquat for use in formulating Defendants' paraquat products, and developed, registered, formulated and distributed Defendants' paraquat products for sale and use in the U.S., including the State of Exposure.

155.    Plaintiff used Defendants' paraquat products in the State of Exposure repeatedly and regularly for hours at a time, resulting in the repeated, regular, and prolonged exposure of Plaintiff to paraquat.

156.    At the time of each sale of Defendants' paraquat products that resulted in Plaintiff's exposure to paraquat, Defendants and those with whom they were acting in concert fraudulently represented that paraquat products pose no risk to human safety.

157.    Defendants and those with whom they were acting in concert knew or should have been aware of the dangers posed to humans by coming in contact with Defendants' paraquat products.

158.    Defendants and those with whom they were acting in concert fraudulently misrepresented the safety of Defendants' paraquat products because they posed a significant risk to humans, to wit causing the degeneration and death of dopaminergic neurons in the SNpc and the onset of Parkinson's disease.

### COUNT 1
### ALL DEFENDANTS
### STRICT PRODUCT LIABILITY – DESIGN DEFECT

159.    Plaintiff incorporates by reference paragraph 1 through 158 as is fully restated herein.

160.    Defendants designed, manufactured, marketed, and sold their paraquat products that were used by Plaintiff, and Defendants were in the business of selling their paraquat products.

161.    Defendants' paraquat products were in an unsafe, defective, and unreasonably dangerous condition at the time they left Defendants' possession because of their design.  In particular, Defendants' paraquat products were defectively designed because they caused serious injuries and death, including but not limited to the degeneration and death of dopaminergic neurons in the SNpc and the onset of Parkinson's disease.

162.    Defendants' paraquat products are unreasonably dangerous as designed because they do not perform safely as an ordinary consumer, including Plaintiff, would expect when used in an intended or reasonably foreseeable manner.

163.    Defendants' paraquat products are unreasonably dangerous as designed because the danger inherent in their design outweighs the benefits of that design.

164.    Defendants caused their paraquat products to enter the stream of commerce and to be sold to consumers, including Plaintiff, through a variety of channels.

165.    Defendants' paraquat products were expected to, and did, reach consumers, including Plaintiff, without substantial change in the condition in which those products were manufactured and sold or otherwise released into the stream of commerce by Defendants.

166.    Plaintiff used the Defendants' paraquat products in the ordinary and expected manner it was intended, recommended, promoted, and marketed by Defendants.

167.    Defendants knew or should have known that their products were in a defective condition as a result of their design and were unreasonably dangerous when used in an intended or reasonably foreseeable manner.

**COUNT 2**
**ALL DEFENDANTS**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**

168.    Plaintiff incorporates by reference paragraph 1 through 158 as is fully restated herein.

169.    Defendants designed, manufactured, marketed, and sold their paraquat products that were used by Plaintiff, and Defendants were in the business of selling paraquat products.

170.    Defendants' paraquat products were in an unsafe, defective, and unreasonably dangerous condition at the time they left Defendants' possession because they were not accompanied by adequate warnings.

171.    In particular, Defendants knew or should have known that their paraquat products could cause serious injuries and death when used in an intended or reasonably foreseeable manner, including but not limited to the degeneration and death of dopaminergic neurons in the SNpc and the onset of Parkinson's disease.  Defendants failed to give appropriate and adequate warning of

such risks.  In fact, Defendants continue to this day to market and sell their products to consumers without adequate warnings of the risks associated with their use.

172.    If Defendants had warned Plaintiff that use of their paraquat products as intended would increase the risk of being seriously injured, including but not limited to the degeneration and death of dopaminergic neurons in the SNpc and the onset of Parkinson's disease, Plaintiff would not have used their paraquat products.

173.    Defendants caused their paraquat products to enter the stream of commerce and to be sold and used by consumers, including Plaintiff, through a variety of channels.

174.    Defendants' paraquat products were expected to, and did, reach consumers and users, including Plaintiff, without substantial change in the condition in which their paraquat products were manufactured and sold or otherwise released into the stream of commerce by Defendants.

175.    Plaintiff used the Defendants' paraquat products for the purposes and in the manner intended, recommended, promoted, and marketed by Defendants.

### COUNT 3
### ALL DEFENDANTS
### NEGLIGENCE

176.     Plaintiff incorporates by reference paragraph 1 through 158 as is fully restated herein.

177.    At all relevant times, Defendants had a duty to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of their paraquat products.

178.    Defendants' duty to exercise reasonable care in the advertising and sale of their paraquat products included a duty to warn Plaintiff and other consumers of the risks and dangers

associated with their paraquat products that were known or should have been known to Defendants at the time of the sale of their products to Plaintiff and their employers.

179.    Defendants also owed a continuing duty to Plaintiff to remove or recall, the unsafe and/or defective paraquat products across the United States (including the State of Exposure). At all relevant times, Defendants knew or should have known through the exercise of reasonable care of the dangers associated with the normal and/or intended use of their paraquat products.

180.    At all relevant times, Defendants knew, or should have known through the exercise of reasonable care, that ordinary consumers such as Plaintiff would not realize the potential risks and dangers of their paraquat products.

181.    Defendants breached their duty of care by manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, selling, and/or distributing of their paraquat products negligently, recklessly, and/or with extreme carelessness and by failing to adequately warn of the risks and dangers of their paraquat products as described in the allegations above. Such breaches include but are not limited to:

a.   Failing to warn consumers of the risks and dangers associated with the use of their hair relaxer products;

b.   Failing to properly test their paraquat products to determine the adequacy or effectiveness of safety measures, if any, prior to releasing their paraquat products for consumer use;

c.   Failing to properly test their paraquat products to determine the increased risk of harm during the normal and/or intended use of their paraquat products;

d.   Designing their paraquat products defectively such that they caused serious injuries or death when used in their intended and reasonably foreseeable manner;

e.   Failing to inform consumers as to the safe and proper methods of handling and using their paraquat products;

f.  Failing to remove or recall their paraquat products from the market when Defendants knew or should have known their paraquat products were defective and/or dangerous;

g.  Marketing and labeling their paraquat products as safe when Defendants knew or should have known their paraquat products were defective and/or dangerous;

h.  Claiming in labeling and marketing that their paraquat products are safe; and

i.  Failing to act like a reasonably prudent company under similar circumstances. Each of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

182.    Defendants knew or should have known that consumers and users such as Plaintiff would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described herein.

183.    Due to Defendants failure to exercise ordinary care or comply with their duties of selling these products, Plaintiff was not able to discover the dangerous nature of Defendants' paraquat products.

## COUNT 4
## ALL DEFENDANTS
## BREACH OF EXPRESS WARRANTIES AND IMPLIED WARRANTY OF MERCHANTABILITY

184.     Plaintiff incorporates by reference paragraph 1 through 158 as is fully restated herein.

185.    Defendants are in the business of manufacturing, supplying, marketing, advertising, warranting, and/or selling paraquat products.

186.    Defendants expressly represented and warranted to Plaintiff and the general public, through statements made by Defendants or their authorized agents in direct-to-consumer marketing, advertisements, and labels, that their paraquat products were safe and effective for their reasonably expected and intended use.

38

187.    Defendants' warranties included but are not limited to the warranties that their paraquat products are safe, including but not limited to the marketing assertions quoted and displayed in the facts alleged above.

188.    These and other (mis)representations were made directly by the manufacturer or seller to consumers and end users of Defendants' paraquat products, constitute express warranties, and became part of the basis of the bargain between the parties and created a collective express warranty that their paraquat products would conform to Defendants' affirmations and promises.

189.    Defendants breached their express warranties about their paraquat products and their qualities because Defendants' statements about their paraquat products' safety were false and their paraquat products did not conform to those affirmations and promises. Defendants' paraquat products were not safe, but rather exposed Plaintiff and other consumers to unreasonable risks of adverse health effects including the degeneration and death of dopaminergic neurons in the SNpc and the onset of Parkinson's Disease.

190.    At the time Plaintiff used Defendants' paraquat products, Defendants knew or should have known that Plaintiff would detrimentally rely on Defendants' misrepresentations regarding safety.

191.    Plaintiff used Defendants' paraquat products reasonably relying upon Defendants' warranties.

192.    Plaintiff used Defendants' paraquat products for the purpose and in the manner intended by Defendants.

193.    Plaintiff could not have discovered the breached warranties or realized Defendants' paraquat products' danger through the use of reasonable care.

194.    Plaintiff would not have purchased or used Defendants' paraquat products if they had known the truth about the misrepresentations described above, or that Defendants' paraquat products were unfit for ordinary use or their particular purpose.

195.    The breach of the warranties was a substantial factor in bringing about Plaintiff's injuries.

196.    Defendants' failure to tender their paraquat products to Plaintiff free of defects constitutes a breach of the written warranties covering their paraquat products.

197.    Defendants are on notice of their defective paraquat products, yet Defendants have failed to cure the damage resulting therefrom within a reasonable time.

198.    Defendants' breach of warranties was a substantial factor in bringing about Plaintiff's injuries.

## COUNT 5
## ALL DEFENDANTS
## FRAUDULENT MISREPRESENTATION

199.    Plaintiff incorporates by reference paragraph 1 through 158 as is fully restated herein.

200.    Defendants, who engaged in the development, manufacture, marketing, sale, and/or distribution of paraquat products, owed a duty to Plaintiff and other consumers to provide accurate and complete information.

201.    Defendants knew or should have known that their paraquat products significantly increase the risk of Parkinson's Disease and other negative health conditions such as the degeneration and death of dopaminergic neurons in the SNpc from the evolving scientific literature and research over the past decades, yet, Defendants willfully deceived consumers by concealing these facts from them, which Defendants had a duty to disclose.

202.   In addition to monitoring the evolving scientific literature, Defendants were or should have been testing their paraquat products to ensure they were not harmful to consumers when used in their intended manner.

203.   At all relevant times, Defendants conducted sales and marketing campaigns that willfully deceived consumers as to the benefits, health risks and consequences of using Defendants' paraquat products, to wit:

   a.   "There is no risk to human safety with the use of paraquat";[58]

   b.   "Paraquat does not cause Parkinson's disease";[59] and

   c.   "Paraquat cannot readily be absorbed through the skin."[60]

204.   Defendants knowingly, falsely, deceptively, and inaccurately designated and represented that their paraquat products were safe, with the intent to mislead and deceive consumers including Plaintiff.

205.   Defendants fraudulently misrepresented the use of their paraquat products as safe, including but not limited to the marketing assertions quoted and displayed in the facts alleged above. Defendants willfully and intentionally failed to disclose and concealed material facts and made false representations regarding the dangers and safety concerns of their paraquat products.

206.   Defendants concealed and suppressed the true facts concerning their paraquat products.

207.   Defendants knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and/or deceitful when they were made.

---

[58] https://www.paraquat.com/en/safety/safety-humans (last visited Oct. 21, 2023)
[59] *Id.*
[60] *Id.*

208.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and/or omissions.

209.    Consumers such as Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced them to use Defendants' paraquat products, sometimes on a regular basis for decades. Consumers did not know about safety concerns with Defendants' paraquat products at the time Defendants made their misrepresentations and/or omissions, and consumers did not discover the true facts until after using Defendants' paraquat products, nor could they have done so with reasonable diligence. Had consumers such as Plaintiff known the true facts, they would not have used Defendants' paraquat products.

210.    Defendants profited significantly from their unlawful conduct that fraudulently induced consumers such as Plaintiff to use the dangerous and defective paraquat products.

211.    Consumers, including Plaintiff, required, and should have been provided with, truthful, accurate, and correct information concerning the safety of Defendants' paraquat products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants on each of the above-referenced.

A.    Awarding compensatory damages, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

C.      Awarding damages and/or equitable relief to provide medical monitoring for the early detection, diagnosis, and treatment of injuries related to the products and prevention of exacerbation of such injuries;

D.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

E.      Statutory damages including treble damages;

F.      Prejudgment interest;

G.      Post judgment interest;

H.      Awarding Plaintiff reasonable attorneys' fees;

I.      Awarding Plaintiff the costs of these proceedings; and

J.      Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to FED. R. CIV. P. 38(b), Plaintiff respectfully demands a jury trial on all issues triable by jury.

Dated: April 12, 2024.

Respectfully submitted,

<u>/s/ Mark Abramowitz</u>
Mark M. Abramowitz*
Mark A. DiCello
Nicholas M. Horattas*
**DiCELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
(440) 953-8888
mabramowitz@dicellolevitt.com
madicello@dicellolevitt.com
nhorattas@dicellolevitt.com

Diandra S. Debrosse Zimmermann*
Eli J. Hare*
**DiCELLO LEVITT LLP**
420 20th Street North
Suite 2525
(205) 740-9555
Birmingham, Alabama 35203
fu@dicellolevitt.com
ehare@dicellolevitt.com

*Counsel for Plaintiff*

44